No. 46,310

STATE OF KANSAS, *Appellant*, v. MICHAEL VOIT, *Appellee*.

(485 P. 2d 1306)

Opinion filed June 12, 1971.

*Max M. Hinkle*, county attorney, argued the cause, and *Vern Miller*, attorney general, and *Edward G. Collister, Jr.*, assistant attorney general, were with him on the brief for the appellant.

*Robert H. Royer*, of Abilene, argued the cause, and was on the brief for the appellee.

The opinion of the court was delivered by

O'CONNOR, J.: This is an interlocutory appeal by the state pursuant to K. S. A. 1970 Supp. 22-3603 from an order of the district court sustaining defendant's motion to suppress evidence.

On October 10, 1969, the Dickinson county sheriff's office was advised that an unoccupied farmhouse owned by Clara Popejoy had been burglarized and numerous antique items were missing therefrom. The house was located three miles south and two miles east of Chapman. The investigating officers learned that on the evening of October 9 a farmer had observed a "champagne-gold colored," new model Chevrolet bearing a New Jersey license plate

HAK 674 on the road near the Popejoy farm. Officials in New Jersey were contacted and it was learned the license had been issued to Ray's Body Shop of Butler, New Jersey, for a 1949 Plymouth automobile. The owner of the body shop reported the tag was missing, and that one Michael Voit (the defendant herein), who was believed to be residing at Route 1, Chapman, was suspected of having taken it. According to the shop owner, Voit had formerly been stationed at Fort Riley, and had married a girl from the Chapman-Abilene area. Upon further investigation, the Dickinson county authorities ascertained that Voit and his wife were living in a farmhouse located approximately one mile west and three-fourths of a mile north of the Popejoy house.

At about 7:45 p. m. on October 10, the sheriff, his deputy, and the county attorney went to the Voit home where they observed a tan Camaro automobile with New Jersey license HAK 674 parked in the yard. They went to the back door where they were met by Mrs. Voit. The three introduced themselves and asked her who owned the Camaro with the New Jersey tag. She replied that the car belonged to her husband. Voit then came to the door and the law enforcement officials, after identifying themselves, inquired of him about ownership of the automobile. When Voit told them he was the owner, they asked to see the registration papers for the vehicle. Voit began searching through his wallet and said, "Why don't you come in the house, it's pretty cold out here; I think the papers are in the house." As the three officials followed Mr. and Mrs. Voit into the kitchen, they passed through a back porch where they observed various items which matched the description of property missing from the Popejoy farmhouse.

After entering the kitchen, Mr. and Mrs. Voit located a registration receipt for a Kansas license issued to the Camaro, but were unable to produce any registration papers pertaining to the New Jersey license plate. Finally, Voit said the tag did not belong to the vehicle. Thereupon, Voit, after being advised by the county attorney of his rights under *Miranda,* stated the New Jersey license belonged on a pick-up which he had brought from New Jersey and he was merely using the tag on the newly-acquired Camaro until he could get a Kansas license. Voit was given a second *Miranda* warning by the deputy sheriff and was informed that the officials wished to question him about the Popejoy burglary and larceny which occurred the night before. At this point the officials recog-

nized other items in the kitchen matching the description of those taken from the Popejoy house.

In response to questioning, Voit denied he had ever been in the burglarized house, but did state that on the evening before he had been rabbit hunting with a friend known only as Jim when they found the various items of property in a ditch alongside the road. The officials advised Voit they believed the property was that stolen from the Popejoy house and asked if there were other articles in the Voit home which had been found at the same time. Several more items were produced, and with the Voits' consent, all the property was placed in the patrol car. Voit, being unable to explain exactly where he had found the property, volunteered to accompany the officials and point out the location. He directed them to a roadside ditch near the Popejoy house. Again, Voit denied having been inside the house, whereupon the deputy sheriff asked him if the fingerprints that were found on the floor in the upstairs southeast room by the window left by someone getting on his hands to look out the shade would be his if they were compared. Voit reflected for a moment and said, "I might as well tell you about it." He proceeded to give a full account of his part in the burglary and larceny. The party returned to Voit's residence where he produced two more items of property not previously revealed to the officials. At this time Voit was placed under arrest.

Based on the foregoing evidence elicited from the sheriff and his deputy, the district court ordered suppression of the articles of personal property seized by the officials and of all testimony concerning defendant's oral admissions. The theory of the trial court in taking such action is not disclosed in the record.

Defendant vigorously contends the property seized was inadmissible for the reason that the law enforcement officials gained entrance to the Voit premises by ruse or subterfuge of investigating a possible misdemeanor, when actually they were searching for evidence from a suspected burglary. Defendant concedes the authorities were lawfully on the premises for the purpose of investigating the license violation, but he maintains the legality of their presence ceased before they were invited into the residence, thus making their entry illegal *ab initio* and the subsequent search unlawful.

The state, on the other hand, makes no attempt to justify seizure of the property on the basis of a search incidental to a lawful arrest or on the ground the authorities had probable cause to search for

contraband. Rather, the claim is made the officials were lawfully on the premises, and upon entering defendant's home at his invitation, saw the fruits of the burglary in plain view, thus giving them the right to seize the stolen articles. We believe the state's position is sound and the district court erred in sustaining the motion to suppress.

When the officials arrived at the Voit residence they found a car of similar description with the same New Jersey license as had been seen near the Popejoy farmhouse on the evening before. They had information the license plate had been stolen or was missing from the rightful owner in New Jersey. The officials were in the process of making a good-faith effort to check the license plate and registration of the vehicle. This part of their investigation was part and parcel of their overall investigation of the burglary and larceny. They had good reason to believe there was a possible connection between the two. In conducting their investigation it was reasonable for the officials to ask the defendant to produce registration papers showing the license was issued for the Camaro which he acknowledged belonged to him. Their entry into the house at defendant's request in no way detracted from the lawfulness of their presence on the premises initially. The fruits of the burglary were there in plain view for anyone to see. No search in fact occurred.

A police officer lawfully on the premises or in a public place can always seize objects which are open to his view if he has reasonable cause to believe they are the fruits of a crime. The eye cannot commit a trespass condemned by the federal and state Constitutions, and mere observation of that which may readily be seen does not constitute a search. (*State v. Frizzell*, 207 Kan. 393, 485 P. 2d 160; *State v. McMillin*, 206 Kan. 3, 476 P. 2d 612; *State v. Yates*, 202 Kan. 406, 449 P. 2d 575, cert. denied, 396 U. S. 996, 24 L. Ed. 2d 461, 90 S. Ct. 496; *State v. Blood*, 190 Kan. 812, 378 P. 2d 548; *Garcia v. Baker*, 421 F. 2d 671 [10th Cir. 1970].) In *Harris v. United States*, 390 U. S. 234, 19 L. Ed. 2d 1067, 88 S. Ct. 992, the court stated:

". . . It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." (p. 236.)

Defendant relies on cases from other jurisdictions holding that when it appears the search was the real object of the officers entering upon the premises and the arrest was only a sham or a front being used as an excuse for making the search, the arrest itself and

the ensuing search are illegal. (*Taglavore v. United States*, 291 F. 2d 262, [9th Cir. 1961]; *McKnight v. United States*, 183 F. 2d 977, [D. C. Cir. 1950].) These decisions are not in point, for here there was no evidence of an arrest being used as a pretext to search the premises for fruits of a crime.

What has been said disposes of defendant's further contention that his oral admissions were properly suppressed because they were the product of an illegal search and seizure. Moreover, we find nothing to support the suggestion that the officers attempted to "mislead, confuse, or frighten" the defendant when they asked him about the possibility of his fingerprints being in the burglarized house. Prior to any questioning, defendant had twice been given the *Miranda* warning. Yet, when confronted with possible evidence against him, he proceeded to make an inculpatory statement.

Under our new code of criminal procedure, when a defendant challenges the admissibility of evidence on the basis it was obtained by an unlawful search and seizure, the state has the burden of proving that the search and seizure was lawful. (K. S. A. 1970 Supp. 22-3216.) Likewise, when any confession or admission is alleged to be inadmissible, the burden rests upon the state to prove their admissibility. (K. S. A. 1970 Supp. 22-3215.)

We hold that the state sustained its burden of proving the challenged evidence was admissible. The judgment is reversed and the case remanded for further proceedings consistent with the views expressed in this opinion.